TUPELO HOTEL Co. *et al. v.* LONG.

(Division B.   Feb. 3, 1930.)

[126 So. 6.   No. 28336.]

J. M. and F. G. Thomas, of Tupelo, for appellants.

Geo. **T.** and **Chas. S. Mitchell,** and **S. H. Long,** all of Tupelo, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

Long was plaintiff in the court below, and sued the hotel company for a commission of one thousand six hundred dollars for services in assisting the hotel company to make a sale of its hotel building to the parties who bought it.

It appears that one Mrs. Mothershed went to Tupelo with a view of buying the Reed Hotel in that city, which

hotel was leased and being operated by a sister of the said Mrs. Mothershed. Being a friend of Mr. Long's, and desiring to confer with him with reference to this purchase, she called him over the telephone, and he went to the hotel, and she related to him her intent and effort to purchase the Reed Hotel. Mr. Long stated to her that the Tupelo Hotel property was on the market, or would be, as certain persons who had purchased or leased it would be unable to carry out their contract, and that the owner would like to sell it. Mrs. Mothershed had made an effort before that time to buy the Tupelo Hotel, but had been told it was not for sale. She seemed to be pleased with the idea that it would be a good buy to purchase the Tupelo Hotel; and Mr. Long went to the president of the Tupelo Hotel Company and took up the matter with him, the result of which we will state in the language of the witness:

"I went to see Mr. Leake and told him I thought I had a prospect for the Tupelo Hotel property and I thought I could sell it for him. He says 'How much do you think you can get for it? I said, 'I don't know what I can get for it; but I don't think I can get as much for it as the former fellows that have fallen down on it agreed to pay, but,' I said, 'if you can get ten thousand dollars cash payment and this property, the farm lands—.' But Mr. Leake evidently misunderstood me about the farming lands; he must have thought that this was extra security and not part payment. He said, 'That proposition might appeal to us if we can get a hundred thousand dollars for the property.' 'But,' I said, 'you will have to pay me a little something out of it as commission;' I don't just exactly know, but something to the effect that I would have to have a commission out of it. He said, 'How much do you want for selling it?' I said the regular commission on that kind of a deal would be five thousand dollars but I will not charge you gentlemen that much, but I would probably put it at about two thousand dollars. He said, 'I will have to see the rest of the committee.' I said, 'Who are the com-

mittee?' He said, 'Clark Strain, Mr. High, and Mr. Robins.' I said 'All right; how long will it take you to see them?' He said, probably an hour or an hour and a half or two hours. I said, 'All right, I will come back a little later.' And I came back later and he said he had seen the committee and some of them thought that two thousand dollars would be too much commission and some of them said a thousand dollars would be enough. 'But,' he said, 'I will give you approximately sixteen hundred dollars;' I said, 'Mem, that approximate proposition won't go with me; but I'll tell you what I will do, I will take sixteen hundred dollars as my commission,' and he said, 'All right; go ahead.' And, in talking about this proposition about the farming lands Mr. Leake said, 'I know who you are figuring with,' he said, 'You are figuring with Mr. Mothershed,' and I said, 'No, not Mr. Mothershed;' he said, 'However, that don't make any difference to us who you are figuring with, we want to sell the property.' When I told Mr. Leake that this farming land was to go in as a payment, it seems that he did not understand it that way but evidently thought that it was to be accepted as extra security. He said they didn't want to take in any farming lands at any price, but that they would consider a hundred thousand dollar proposition ten thousand dollars cash. So, I carried messages back and forth and finally Mrs. Mothershed said, 'I would not want to go into a deal as big as that without trying it out first; if they will lease me the property for twelve months with an option of buying it at the end of the twelve months I might consider taking the property at that price, but we would not want to bind ourselves to pay a hundred thousand dollars without first seeing if it would go;' and I carried that message to Mr. Leake and Mr. Leake said, 'We would not consider leasing it without we were sure in our minds that it would be a sale, because we want to sell' and he said, 'in order to make sure you keep after these people in this proposition and this commission I am going to pay you will be five hundred dollars when the trade is

made when the first ten thousand dollars is paid, and five hundred dollars a year every ten thousand dollars is paid and that will keep you after them and time you get your full amount they will have paid forty or fifty thousand dollars.' I carried messages back and forth and finally I said, 'My business is hurting and there is not any use in me staying here as it will take several days for you to get your transaction to go,' and he said, 'Well, we won't need you here, we can attend to it as well without you as we can with you.' And that is about the sum and' substance of what took place.''

The negotiations resulted in a contract being made between the hotel company and Mrs. W. A. Mothershed, W. A. Mothershed, and R. B. Taliaferro, by which the parties leased the hotel at seven hundred fifty dollars per month for a period of twelve months, with an option to buy the property at any time during the lease for the sum of one hundred thousand dollars, ten thousand dollars cash, and the balance on reasonable terms. About the 1st of October, following, and about two months before the lease would expire, a trade was made between the hotel company and W. A. Mothershed by which the hotel property was sold to Mothershed for eighty-nine thousand five hundred dollars; four thousand five hundred dollars in cash, and the assumption by Mothershed of fifty thousand dollars in bonds against the hotel; and thirty-five thousand dollars in one hundred seventeen monthly installments, the first payable October 1, 1925, for three hundred dollars, and the next one hundred fifteen installments represented by notes in the sum of three hundred dollars each.

After this sale, Long waited for some two or three months, and then took up with the parties his demand for a commission, which they refused to pay. There was a trial resulting in a judgment in favor of the plaintiff for one thousand six hundred dollars.

Mr. Leake, as stated above, was president of the company, and it appears that the hotel company desired to sell the hotel building, and had asked Mr. Leake to see

about making a sale. It appears from Mr. Leake's testimony:

"Q. Did you take it up with them at any time about paying him a commission prior to the making of the sale? A. No, I merely told them (referring to the directors of the hotel company) that if he could make a sale he wanted a commission but we had not agreed on the amount, but it was my idea to make that satisfactory but I told them at the time if he made a sale it was not to be with the Mothersheds."

On cross-examination Mr. Leake was asked the question:

"Q. Mr. Leake, at the time this contract was made with the Mothersheds to lease the hotel and giving them an option to buy it within a year's time for a hundred thousand dollars, at that time you were the President of the Tupelo Hotel Company? A. Yes, sir.

"Q. And had authority from the other interested parties to sell this property? A. They asked me to see if I could sell it. . . .

"Q. The other interested parties knew that you were trying to dispose of the hotel, of course? A. Some of them did, I know.

"Q. Now, didn't you all have some kind of a committee appointed for this purpose? A. Yes, sir.

"Q. And the other members of the committee appointed by the directors or stockholders, or whoever appointed them, the other members of that committee knew that you were making an effort to sell it? A. Yes, sir.

. . . .

"Q. Then Mr. Pearl Long, the plaintiff in this case, did come to you and confer with you about selling the property? A. Yes, sir.

"Q. And you made him a price, I believe, of a hundred thousand dollars? A. Yes, sir.

"Q. And something was said there about paying him a commission if he was successful in making the sale? A. Yes, sir."

Mr. S. J. High who was also one of the directors, and later president of the company, and who bought Mr. Leake's stock in the hotel, testified to the following:

"Q. Did you have any knowledge at that time that there was an obligation outstanding to pay Mr. Long one thousand six hundred dollars commission? A. No, sir. The way it came about is this; Mr. Long is correct possibly in the casual conversation we had on the street; in the conversation he said, 'Jim, I told Mem I thought I could sell the hotel property for him;' a little later in a casual conversation with Mr. Leake, I do not remember exactly his words, but he told about his conversation with Mr. Long and about saying to him 'not the Mothersheds.' I was President of the Tupelo Hotel Company for quite a while and while I was President the Mothersheds had approached me about the hotel; we were cognizant of the Mothersheds being interested in the hotel property."

The plaintiff further proved by Mrs. Mothershed that they would have paid the one hundred thousand dollars rather than miss the trade, but that they were trying to get the property as cheaply as possible. It is contended that Mr. Leake had no authority to bind the hotel company in employing Mr. Long on a commission to assist in putting the deal through, and also that notice to Mr. Leake of Mr. Long's claim to a commission was not notice to the hotel company.

We think that there was ample evidence to show that Mr. Leake had authority to make the contract with Mr. Long; that the hotel was for sale; that a committee had been appointed to make the sale; that Mr. Leake, who was president of the hotel company, had been asked to look out for a sale; and that he had authority to employ Mr. Long to make the sale. First National Bank v. Leeton & Bro., 131 Miss. 324, 95 So. 445; Moyse Real Estate Co. v. First National Bank of Commerce, 110 Miss. 620, 70 So. 821; Allen Gravel Company v. Nix, 129 Miss. 809, 93 So. 244; Metzger v. Southern Bank, 98 Miss.

108, 54 So. 241; Meder v. Superior Oil Company, 151 Miss. 814, 119 So. 318. This last case is very much like the one involved here. Whatever the rule may be in other jurisdictions, the rule in Mississippi, as shown by the above authorities and others, is that the president. of a company has prima-facie authority to represent the company in business transactions. The decision here, however, need not be rested upon presumption; it is sufficiently shown by the record, we think, that Mr. Leake was requested to sell the property. This request was made by the directors, of which he was a member, and at the time of this transaction it was not necessary to have any written contract about the matter in order to bind the hotel company.

The plaintiff's evidence is sufficient, and was accepted by the jury, as being true, to establish liability for the services rendered by the plaintiff. The fact that the hotel was not sold for the amount of the option contained in the lease contract does not defeat the action here. The company through its president had knowledge of Mr. Long's right to a commission if the contract was carried out. It did not notify him, or call on him in any particular, to make any further effort to induce the lessees to buy the hotel at the price stated, nor did they seek his services in any particular, after the execution of the lease, in procuring the lessees to buy the property. Had such notice or request been made, it is quite possible that the sale could have been made at the stipulated price. The hotel company cannot, by cutting under the price contained in the option, defeat the plaintiff's right to his commission, because the evidence tends to show that the sale would have been made had not such cut in the price been made. We are therefore of the opinion that the judgment should be affirmed.

Affirmed.

**Anderson, J.,** disqualified, and took no part.